# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| DEAN SHERMAN, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No. K18C-06-009 JJC |
| | : | In and for Kent County |
| v. | : | |
| | : | |
| STEPHEN P. ELLIS, ESQUIRE, | : | |
| | : | |
| | : | |
| | : | |
| Defendant. | : | |

## OPINION

Submitted: November 22, 2019
Decided:  January 2, 2020

Patrick K. Gibson, Esquire, Ippoliti Law Group, Wilmington, Delaware, *Attorney for Plaintiff.*

Colleen D. Shields, Esquire, Gary W. Lipkin, Esquire, & Alexandra D. Rogin, Esquire, Eckert Seamans Cherin & Mellott, LLC, Wilmington, Delaware, *Attorneys for Defendant.*

**Clark, J.**

Plaintiff Dean Sherman sues his former attorney, Stephen Ellis, Esquire, for legal malpractice. Prior to Mr. Sherman's 1997 marriage, Mr. Ellis drafted a premarital agreement (the "Agreement") designed to protect Mr. Sherman's assets. Mr. Sherman then presented the Agreement to his fiancé.[1] The Agreement waived her right, upon divorce, to receive alimony or to share in wealth accumulated over the course of their marriage. Her attorney advised her not to sign it but she nevertheless did.

During their divorce proceedings in 2015, Mr. Sherman's wife challenged the Agreement's enforceability in Family Court. The Family Court found it to be unconscionable and thus unenforceable. The Delaware Supreme Court, however, reversed the Family Court's decision. In the end, the Agreement successfully barred her challenges.

Notwithstanding Mr. Sherman's success after appeal, he now sues Mr. Ellis because he did not include a waiver of disclosure clause in the draft agreement. According to Mr. Sherman's expert, it would have been a "silver bullet" removing the incentive for his ex-wife to engage in protracted litigation. Mr. Sherman claims that this expanded litigation in turn expanded his costs and fees. He now seeks to recover those attorney and expert fees from Mr. Ellis.

Presently, Mr. Ellis seeks summary judgment in a motion that raises two principal issues. First, the motion requires the Court to evaluate the legal foundation for Mr. Sherman's expert's standard of care opinion. Second, with regard to proximate cause, the motion addresses a plaintiff's ability to recover for legal malpractice in drafting a premarital agreement that, in the end, successfully

---

[1] Mr. Sherman's former spouse is not a party. The Court will refer to her as Mr. Sherman's fiancé, wife, or ex-wife as did the Delaware Supreme Court when it assigned her a pseudonym in the underlying action. *See Silverman v. Silverman*, 206 A.3d 825 (Del. 2019) (assigning pseudonyms and general titles to the parties).

protected the plaintiff's assets. To evaluate the second issue, the Court must address whether the standard for proximate cause in transactional legal malpractice claims differs from the standard applied in litigation legal malpractice claims.

For the reasons that follow, genuine issues of material fact remain regarding the applicable standard of care and whether Mr. Ellis breached that standard. However, in this case, there is insufficient evidence of record to support an inference that Mr. Sherman's ex-wife would have agreed to include this "silver bullet" term in the Agreement. In addressing an issue of first impression, the same "but for" proximate cause limitation that applies in litigation malpractice actions must apply in transactional legal malpractice actions. When applying that standard, because record evidence does not support an inference that Mr. Sherman's ex-wife would have likely accepted the term, the trier of fact would be forced to speculate regarding whether Mr. Ellis's alleged negligence proximately caused Mr. Sherman harm. For that reason, Mr. Ellis's motion for summary judgment must be **GRANTED**.

## FACTS AND PROCEDURAL BACKGROUND

The recited facts are those of record when viewed in the light most favorable to Mr. Sherman, the non-movant. In 1997, Mr. Sherman retained Mr. Ellis to negotiate and draft the Agreement prior to his marriage. The draft included provisions designed to protect Mr. Sherman's assets in the event of a divorce. It also included a mutual waiver of alimony. Finally, it included a clause recognizing that both parties had fully disclosed their premarital assets.[2] The proposed agreement,

---

[2] Pl. Response, Ex. A., Ex. 1, "Ante-Nuptial Agreement" at 3 (providing "[t]he parties hereby acknowledge that each of them has made a full disclosure to the other of all property owned or otherwise held by each respective party on Exhibits 'A' and 'B' attached hereto").

3

however, did not contain a waiver of the parties' obligations to disclose assets and obligations "beyond the disclosure provided."[3]

Before his fiancé signed the Agreement, she consulted with an attorney. Her attorney first asked Mr. Sherman to revise the proposed agreement to secure her future financial security. Mr. Sherman rejected those requests with the exception of one minor issue. His fiancé then met with her attorney to review the Agreement. He told her that it was one-sided and that she should not sign it. Notwithstanding this advice, she executed it. When doing so, she acknowledged in writing that her attorney had advised her not to. The two then married.

In 2015, Mr. Sherman's wife filed for divorce and moved to set aside the Agreement. At that point, Mr. Sherman's assets exceeded twelve million dollars and his annual income exceeded one million dollars. In contrast, she had no independent income or separate assets. In her motion to set aside the Agreement, she argued that it was unenforceable because she did not execute it voluntarily.[4] She also argued that the Agreement was unconscionable because (1) she was not provided a fair and reasonable disclosure of Mr. Sherman's property, and (2) because she "did not voluntarily and expressly waive in writing any right to that disclosure."[5]

Prior to the parties' execution of the Agreement in 1997, Mr. Sherman had disclosed in writing his then four million dollars in assets.[6] The disclosure, however, contained errors. Namely, it omitted that he owned a Ford Explorer (though his fiancé had nearly exclusive use of it prior to the disclosure) as well as a three thousand dollar life insurance policy. It also inaccurately described his one hundred

---

[3] *See* 13 *Del. C.* § 326(a)(2)b (permitting a waiver of disclosures beyond those provided).
[4] *See id.* at § 326(a)(1) (providing a premarital agreement is unenforceable if not executed voluntarily).
[5] Pl. Response, Ex. A, Ex. 3, "Motion to Set Aside Ante-Nuptial Agreement," at ¶ 5.
[6] Pl. Response, Ex. A, Ex. 1 at 7.

percent interest in a two hundred acre property as a fifty percent interest.[7]  In the Family Court property division litigation, after discovery, briefing, and oral argument, that court held the Agreement to be unconscionable.  Because of the disclosure errors, it also held that Mr. Sherman's disclosure of assets and liabilities was not fair and reasonable.[8]

Mr. Sherman then filed an interlocutory appeal to the Delaware Supreme Court.  With that appeal pending, Mr. Sherman filed the current legal malpractice suit against Mr. Ellis.  The then legal backdrop to the malpractice case included only the adverse Family Court finding, which at that point was on appeal.

After Mr. Sherman filed suit, the Delaware Supreme Court reversed the Family Court's decision.[9]  When doing so, it confirmed that Mr. Sherman's ex-wife had voluntarily executed the Agreement[10] and that Mr. Sherman's disclosure of his property and financial obligations was fair and reasonable.[11]  As a result, the Supreme Court held it to be immaterial whether or not the Agreement was unconscionable.[12]  It held the Agreement to be enforceable.[13]

Nevertheless, Mr. Sherman continues to prosecute his legal malpractice claim against Mr. Ellis.  In doing so, he seeks to recover significant attorneys' fees that he alleges he incurred while litigating the unconscionability of the Agreement in Family Court and on appeal.  His claim centers on Mr. Ellis's allegedly negligent failure to

---

[7] *Id. See also Silverman v. Silverman*, 206 A.3d 825, 833 (Del. 2019) (summarizing the errors in the disclosures).

[8] *Sherman v. Sherman*, No. CS15-01396, 2018 (Del. Fam. Apr. 4, 2018).

[9] *Silverman*, 206 A.3d at 834.

[10] *Id.* at 829 (explaining that "[t]he parties have accepted the Family Court's ruling that Wife voluntarily entered into the premarital agreement. Thus, voluntariness is no longer at issue.").

[11] *Id.* at 833–34.

[12] *Id.* at 834.

[13] *Id.*

include a single clause or sentence in the Agreement—a waiver of disclosures term authorized by Delaware's Premarital Agreement Act (the "Act").[14]

The Act recognizes that a clause in a premarital agreement that waives further disclosure of assets or financial obligations has a direct bearing on the enforceability of a premarital agreement.[15] While the parties dispute the effect of this portion of the Act, there is no dispute that the Agreement contained no waiver of disclosure provision.

In the present suit, Mr. Sherman identified Judy Jones, Esquire, as his expert witness. In her report and deposition testimony, Ms. Jones opines that including the waiver provision would by itself have precluded any claim that the Agreement was unconscionable. As a result, she further opines that the standard of care for a domestic attorney as of 1997 required an attorney to include this waiver provision in the Agreement. Mr. Ellis's expert counters that the standard of care did not require Mr. Ellis to include such a provision.

Apart from the standard of care issue, evidence of record relevant to proximate cause of harm is limited to three sources. First, Mr. Sherman's litigation attorney, David Gagne, Esquire, testified in his deposition that Mr. Sherman incurred additional fees and costs because Mr. Ellis did not include the provision in the Agreement. Specifically, Mr. Gagne testified as a fact witness that because Mr. Ellis did not include this language, Mr. Sherman had to hire two experts to address property values that would have otherwise been unnecessary.[16] Those expert fees were approximately $38,000. Mr. Gagne also estimated that $285,000 of a total of $310,000 in attorneys' fees that he charged were necessary only because Mr. Ellis

---

[14] *See* 13 *Del. C.* §§ 321–28.

[15] *See* 13 *Del. C.* § 326.

[16] Mr. Ellis also filed a motion *in limine* to exclude Mr. Gagne's testimony to the extent that it includes expert opinions. The Court need not decide that motion for purposes of this decision.

6

did not include the disputed provision in the Agreement. Second, Ms. Jones offers her expert opinion that Mr. Ellis's failure to include this term proximately caused the increased costs and fees identified by Mr. Gagne. Third, Mr. Sherman argues that his ex-wife's agreement to what were otherwise draconian terms in a one-sided Agreement circumstantially supports a reasonable inference that she would have agreed to anything he asked, including the waiver of disclosure provision.

Notwithstanding that his ex-wife agreed to other one-sided terms, there is no evidence of record addressing her impressions regarding a waiver of disclosure provision or her willingness to agree to one. Namely, there is no direct evidence from her or the then-attorney that bears upon what other terms she may have agreed to. While she agreed to the vast majority, but not all of the terms proposed in the draft agreement, Mr. Sherman did not depose her or her then-attorney regarding how she would have reacted to the provision at issue. Likewise, there is no correspondence, documentary evidence, or circumstantial evidence demonstrating her propensity to agree to that specific provision.

Mr. Ellis now moves for summary judgment. He has also filed a motion *in limine* to exclude Ms. Jones's expert opinions regarding standard of care and proximate cause of damages. Because Ms. Jones offers opinions regarding each element of Mr. Sherman's malpractice claim, the foundation for her opinions must be addressed when deciding Mr. Ellis's motion for summary judgment.

## ARGUMENTS OF THE PARTIES

Mr. Ellis raises three arguments in support of his motion. First, he argues that there is no genuine issue of material fact regarding the standard of care. In support of this argument, he relies upon his expert's opinion that the standard of care did not require the waiver language to be included in the Agreement. Furthermore, he asks the Court to disregard Ms. Jones's expert opinion because she allegedly

7

misinterprets a provision in the Act that anchors her standard of care opinion. Because she misinterprets the statute, he argues that her opinion has no foundation and should be rejected for purposes of summary judgment.

Second, he argues that because the Agreement survived a legal challenge and protected Mr. Sherman's assets, Mr. Sherman's claim fails as a matter of law. He concedes the absence of mandatory authority or in-State persuasive authority regarding transactional malpractice claims. Rather, Mr. Ellis cites other states' authority holding that a legal malpractice plaintiff must demonstrate that, but for the defendant's conduct, he or she would have obtained a more favorable result than the one obtained. According to Mr. Ellis, applying the same "case within a case" approach used by many courts in litigation malpractice actions, mandates summary judgment in this case.

Third, Mr. Ellis argues that Mr. Sherman's claim is "fatally speculative."[17] He lists six assumptions that a jury would need to speculate about before it could find proximate cause of harm. Namely, he argues that Mr. Sherman's claim requires speculation regarding the following: (1) Mr. Sherman's former wife would have accepted the waiver of disclosure language if Mr. Ellis had proposed it; (2) Mr. Ellis never, in fact, proposed the language; (3) if he included the language in the Agreement, she would not have challenged the Agreement anyway; (4) the litigation expenses would have been less had he included the waiver of disclosure language; (5) the Family Court would have ruled differently if the waiver language was included; and (6) Mr. Sherman's ex-wife, as opposed to Mr. Sherman, would not have appealed if she had lost in Family Court.[18] On balance, he argues that because there is no evidence regarding Mr. Sherman's ex-wife's willingness to have agreed

---

[17] Def. Ellis Opening Br. at 10.
[18] *Id.* at 5.

to this pivotal term or her resolve to continue litigating under various scenarios, proximate cause of harm to Mr. Sherman is speculative.

In response, Mr. Sherman argues that the evidence of record creates issues of material fact precluding summary judgment. Namely, he argues that the conflicting deposition testimonies of his and Mr. Ellis's expert witnesses create a jury question as to the appropriate standard of care. Mr. Sherman also argues that Ms. Jones's interpretation of the Act is correct as a matter of law. Finally, Mr. Sherman urges the Court to apply a relaxed approach when evaluating proximate cause of damages. He argues that the relationship of damages to the negligence alleged is not speculative when applying this relaxed standard.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[19] The Court must view the evidence in the light most favorable to the non-moving party.[20] The burden of proof is initially on the moving party.[21] However, if the movant meets his or her initial burden, then the burden shifts to the non-moving party to demonstrate the existence of material issues of fact.[22] The non-movant's evidence of material facts in dispute must be sufficient to withstand a motion for judgment as a matter of law and sufficient to support the verdict of a reasonable jury.[23]

---

[19] Super. Ct. Civ. R. 56(c); *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).
[20] *Brozaka v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).
[21] Super. Ct. Civ. R. 56(e); *Moore*, 405 A.2d at 680 (Del. 1979).
[22] *Moore*, 405 A.2d at 681 (citing *Hurtt v. Goleburn*, 330 A.2d 134 (Del. 1974)).
[23] *Lum v. Anderson*, 2004 WL 772074, at *2 (Del. Super. Mar. 10, 2004).

## ANALYSIS

The Court must first determine whether there is a genuine issue of material fact regarding the standard of care applicable to Mr. Ellis. Because (1) expert testimony regarding this issue is necessary, and (2) Mr. Sherman's expert relies upon her interpretation of the Act to support her opinion, the Court must determine if the Act supports her position. Next, the Court must address whether Mr. Sherman states a claim when the Agreement ultimately protected his assets. In other words, is there any legally recognizable harm when the Agreement fulfilled its primary purpose, although through a more circuitous route? Finally, the Court must address whether the evidence of record, when examined in the light most favorable to Mr. Sherman, demonstrates a genuine issue of material fact regarding proximate cause.

### The record demonstrates a genuine issue of material fact regarding the applicable standard of care and whether Mr. Ellis breached it.

Central to the Court's decision regarding the standard of care is Mr. Ellis's motion *in limine* to exclude Ms. Jones's opinion regarding the applicable standard of care.[24] Expert testimony is required for a plaintiff to establish the standard of care in a legal malpractice case. As to the standard of care, the parties offer competing expert opinions. Ms. Jones's relevant opinion includes that Mr. Ellis "acted negligently and breached the applicable standard of care for a Delaware lawyer when

---

[24] Neither Mr. Ellis nor Mr. Sherman couched their submissions in terms of a *Daubert* challenge. Foundational requirements are an aspect of a *Daubert* review. *See Perry v. Berkley*, 996 A.2d 1262, 1267 (Del. 2010) (explaining the Delaware Supreme Court "has adopted the United States Supreme Court holding in *Daubert* [*v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–95 (1993)], which requires that an expert's opinion be based upon a proper factual foundation and sound methodology to be admissible, as the correct interpretation of D.R.E. 702"). Because the parties proceeded immediately to their contrary arguments regarding the proper interpretation of the Act and whether Ms. Jones's interpretation provides an adequate foundation for her opinion, the Court will focus only on that aspect of the *Daubert* requirements.

10

he failed to include in the [Agreement] a written waiver of further disclosure of property or financial obligations as permitted by 13 *Del. C.* § 326(a)(2)[b]."[25]

Mr. Ellis argues that because Ms. Jones incorrectly interprets the cited statute, her opinion deserves no weight and need not be accepted for summary judgment purposes. Mr. Sherman counters that had Mr. Ellis included one sentence in the Agreement, it would have significantly minimized Mr. Sherman's attorney fees and expert costs.

The parties agree that the standard of care issue centers on their contrary interpretations of a provision in Delaware's version[26] of the Uniform Premarital Agreement Act (the "UPAA"). The provision of the Act relevant to this dispute is Section 326. In relevant part, it provides:

(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:
(1) Such party did not execute the agreement voluntarily; or
(2) The agreement was unconscionable when it was executed and, before execution of the agreement, that party;
  a. Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
  b. Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
  c. Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.[27]

In paragraphs (1) and (2) of Subsection 326(a) of the Act, the General Assembly provided two independent bases to challenge the enforceability of a

---

[25] Pl. Response, Ex. C, at 7.
[26] *See* 13 *Del. C.* §§ 321–28 (where the General Assembly enacted Delaware's version of the UPAA).
[27] 13 *Del C.* § 326.

11

premarital agreement: involuntariness in execution *or* unconscionability. In the underlying litigation, Mr. Sherman's ex-wife challenged the Agreement based upon both.

With regard to unconscionability, Ms. Jones opines that had Mr. Ellis included a provision mirroring the language in subparagraph (a)(2)b, it would have acted as a "silver bullet" to any challenge to the Agreement based upon unconscionability. Mr. Sherman provided a written disclosure of his property and obligations as required by subparagraph (a)(2)a, and the Supreme Court held it to be fair and reasonable. However, the Agreement included no waiver as contemplated in subparagraph (a)(2)b. That, according to Mr. Sherman's theory of the case, would have limited the arguments in Family Court, and later in the Delaware Supreme Court, to whether his former wife executed the Agreement voluntarily. That limited scope, in turn, Mr. Sherman argues, would have prevented the need to litigate the highly factual issue of the fairness and reasonableness of the disclosure as referenced in subparagraph (a)(2)a.

Mr. Ellis counters that there is no meaningful way to interpret subparagraphs (a)(2)a and (a)(2)b to provide any guidance of value to an agreement drafter. He further argues that regardless of whether he included (a)(2)b's waiver of disclosure language in the Agreement, the parties would have still needed to litigate the issue presented under (a)(2)a — that is, whether the initial disclosure was fair and reasonable.

Mr. Ellis reasonably argues that the interrelationship of these two provisions is unclear. They seem to contradict each other to a certain extent. Namely, the statute requires that there be a "fair and reasonable disclosure" on one hand, while also permitting a written waiver of disclosure on the other hand. The only qualifying language in the Act regarding the nature of the waiver is that it is effective "beyond the disclosure provided." The Act does not define that phrase. It is unclear whether

a correction to the first disclosure would qualify as one being "beyond the disclosure provided." It is also unclear regarding whether a "disclosure beyond the disclosure provided" could obviate the need for a party to provide a fair and equitable disclosure in the first instance. At oral argument, neither party provided the Court with authority addressing the interrelationship of the two provisions.

In written supplements, both parties provided contrary persuasive authority supporting contrary readings of the UPAA.[28] The Court's overriding goal in statutory construction must be to implement the General Assembly's intent.[29] When doing so, it must first look to the plain language of the statute.[30] Here, in the underlying litigation, the Delaware Supreme Court addressed the statute's structure as follows:

> to render the premarital agreement unenforceable under the statute [based upon unconscionability], the spouse contesting enforcement must prove that the agreement is unconscionable *and* prove *three other grounds* – lack of fair and reasonable disclosure of the other spouse's property or financial obligations, *non-waiver,* and lack of adequate knowledge of [the other spouse's] property and financial obligations.[31]

In this matter's underlying litigation, the Supreme Court did not expressly address the effect of failing to include a waiver of disclosure provision. Nor was it necessary for the Court to define "non-waiver" in the passage quoted above.

---

[28] Mr. Ellis offers a Kansas Supreme Court decision interpreting the provision in the UPAA to refer to "a waiver of any *future* disclosures, and not to a waiver of any and all disclosures made in the past." *Davis v. Miller*, 7 P.3d 1223, 1229–30 (Kan. 2000) (emphasis added). Mr. Ellis also cites a Georgia appeals court decision holding that the UPAA does not provide that the waiver of disclosure provisions is a "silver bullet." *Kwon v. Kwon*, 775 S.E.2d 611, 615–16 (Ga. App. Ct. 2015). In response, Mr. Sherman cites an Illinois appellate court decision, *In re Marriage of Solano*, 124 N.E. 3d 1097 (Ill. App. Ct. 2019). In that decision, the Illinois court held that the waiver of disclosure provision in the UPAA is effective as to all disclosures, past and present. *Id.* at 1111.

[29] *Zambrana v. State*, 118 A.3d 773, 775–76 (Del. 2015).

[30] *Friends of H. Fletcher Brown Mansion v. City of Wilmington*, 34 A.3d 1055, 1059 (Del. 2011) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, (1917)).

[31] *Silverman* 206 A.2d at 832–33 (emphasis added).

Nevertheless, its statutory interpretation of Subsection 326(a) controls. When applying this interpretation, it follows that whatever further disclosures "beyond the disclosure provided" are, if the premarital agreement includes language waiving such a disclosure, then it is impossible for the challenging party to invalidate a premarital agreement based upon unconscionability.

Mr. Ellis relies upon the rule of statutory construction that statutes should not be read to render their provisions meaningless.[32] In this regard, he argues that the two subparagraphs when read in *pari materia*, cannot be reconciled. Regardless of the difficulty in interpreting and applying the two provisions, the Act's plain language must control. Here, the policy and rationale behind including such a "silver bullet" is for the General Assembly to decide, not the Court. By including subparagraph (a)(2)b in the Act, the General Assembly has permitted any party who includes a waiver of disclosure provision in a premarital agreement to in all cases defeat a challenge to the Agreement based upon alleged unconscionability. As the Delaware Supreme Court recognized in the underlying case, "[i]t may be time to take another look at Delaware's premarital agreement law . . ."[33] When observing this, the Supreme Court based this recommendation, in part, upon the circumstances of this case (in the underlying litigation) and, in part, upon other states' decisions to adjust the UPAA based upon their experiences.[34]

On balance, given the Delaware Supreme Court's guidance in *Silverman*, the plain language of the statute, and persuasive authority interpreting the UPAA consistently with Ms. Jones's interpretation, there is an adequate foundation for Ms. Jones's interpretation. As a result, in total, the record includes competing opinions

---

[32] *See* 1A Sutherland Statutory Construction § 21:1 (7th ed.) (explaining that [c]ourts should construe a statute, if possible, so no term is rendered superfluous or meaningless").
[33] *Silverman*, 206 A.3d at 834, n. 46.
[34] *Id*.

regarding the necessary standard of care that applied in 1997 to an attorney drafting a premarital agreement designed to protect a client's assets.[35] The opposing experts evaluated Mr. Ellis's performance in light of the applicable standards of care that they described.[36] These competing opinions create issues of fact regarding the applicable standard and whether Mr. Ellis breached it.[37] As a result, summary judgment is inappropriate on those bases.

**Proximate cause in a transactional legal malpractice claim must be evaluated under the same traditional principals of tort law that apply to litigation malpractice claims.**

In Delaware, the elements of a legal malpractice claim include "(1) the employment of the attorney; (2) the attorney's neglect of a reasonable duty; and (3) the fact that such negligence resulted in and was the proximate cause of loss to the

---

[35] Delaware adopted the Act the year prior, in 1996. 70 Del. Laws ch. 462, § 2 (1996).
   *Compare also* Pl. Response, Ex. D "Deposition of Judy M. Jones," at 47 providing:

> Q: Any time an attorney, in your opinion represents a spouse seeking to protect his or her assets in drafting a prenuptial agreement, is it your belief that any time that they did not suggest including that waiver language, they are committing malpractice to their client?
> A: Probably yes.

*with* Pl. Response, Ex. E "Deposition of Kathryn Laffey," at 55 providing:

> Q: So you don't believe the standard of care of the Delaware family lawyer preparing a prenuptial agreement requires this inclusion of this disclosure waiver language?
> A: Certainly not in 1997.

[36] *Compare* Pl. Response, Ex. D "Deposition of Judy M. Jones," at 102.

> Q: And again, is it your opinion within a reasonable degree of professional certainty based on your professional experience, that Mr. Ellis' failure to include the waiver language . . . was a deviation from the applicable standard of care expected of a Delaware family lawyer?
> A: Yes, it was. It was a deviation.

*with* Pl. Response, Ex. E "Deposition of Kathryn Laffey," at 50.

> Q: Do you believe that Stephen Ellis deviated from the applicable standard of care in the drafting of this document?
> A: No.

[37] *See Streevy v. Roberts*, 2007 Del. Super. LEXIS 2634 (Del. Super. Mar. 21, 2007) (explaining that "competing expert testimony is a classic issue of fact for the jury").

client."[38]   Often, legal malpractice claims arise out of an attorney's conduct during the course of litigation.  In those circumstances, the plaintiff must "demonstrate that the underlying action would have been successful but for the attorney's negligence."[39]

In the litigation context, the general rule requires analyzing a "case within a case."  Namely, a legal malpractice plaintiff cannot succeed in a claim unless he or she can demonstrate that but for the defendant's negligence in a litigated case, the plaintiff would have won.[40]  While Delaware case law has not used the specific "case within a case" nomenclature, Delaware law aligns directly with that general approach in litigation malpractice cases.  Namely, in *Flowers v. Ramunno*,[41] the Delaware Supreme Court articulated the causation standard for such a claim.   In that decision, the Court required the plaintiff to "demonstrate that *the underlying action would have been successful* but for the attorney's negligence."[42]

Other legal malpractice actions, however, stem from attorney representations in transactions.  Legal malpractice actions in the transactional context often do not look back on the success or failure of litigation, but involve evaluating an attorney's actions that, at the time, looked forward toward a future deal, settlement, or the prevention of litigation.

Distilling a general rule for transactional malpractice cases has caused more uncertainty than in the binary, win versus lose, litigation setting.  Transactional legal malpractice cases may arise from an attorney's drafting of a release, or as in this case, a premarital agreement.  In such transactional representation claims, some of those cases follow a loss to the client in litigation.  Such cases fit more easily within

---

[38] *Weaver v. Lukoff*, 511 A.2d 1044, 1986 WL 17121, at *1 (Del. July 1, 1986) (TABLE).
[39] *Flowers v. Ramunno*, 27 A.3d 551, 2011 WL 3592966 at *2 (Del. Aug. 16, 2011) (TABLE).
[40] *Id.*
[41] *Id.*
[42] *Id.* (emphasis added).

16

the general rule for causation used in litigation malpractice. At some point, there was often a poor result in an underlying suit.

Other transactional malpractice cases, however, stem from lost profits, a disappointing settlement or sale price, or a lost benefit of the bargain. For instance, they may include claims that an attorney's malpractice caused lost profits in a deal that the parties did not consummate, or did so under less favorable terms than were possible. These claims may also, *inter alia*, involve lost net profit because an attorney either negligently prepared documents or negligently represented a party in negotiations. In those transactional malpractice cases, the success of an "underlying action" cannot be gauged in binary terms such as winning or losing.

To date, the Delaware Supreme Court has not addressed the standard for proximate cause in transactional malpractice claims.[43] A number of other jurisdictions have examined the issue and align in two camps.[44] Some jurisdictions continue to use a "case within a case" framework while modifying its application by applying a "but for" causation requirement in the transactional context. On the other hand, some courts provide for a more relaxed causation approach in transactional legal malpractice cases due to the number of variables involved in a successful transaction. Mr. Sherman advocates this relaxed approach and equates it to a loss of

---

[43] *But see Dickerson v. Murray*, 2016 WL 1613286 at *4 (Del. Super. Mar. 24, 2016) (relying upon a decision of the Court of Appeals of Ohio to explain application of the "walk away" scenario in legal malpractice claims in a manner that seems to relax the standard for proximate cause without articulating the standard).

[44] *See* George S. Mahaffey Jr., *CAUSE-IN-FACT AND THE PLAINTIFF'S BURDEN OF PROOF WITH REGARD TO CAUSATION AND DAMAGES IN TRANSACTIONAL LEGAL MALPRACTICE MATTERS: THE NECESSITY OF DEMONSTRATING THE BETTER DEAL*, 37 Suffolk U. L. Rev. 393 (2004) [hereinafter *Cause-in-Fact*] (generally discussing legal malpractice and specifically addressing the dispute regarding the causation in transactional malpractice claims, including the "Case-within-a-Case" approach). *See also* John M. Palmeri & Franz Hardy, *TRANSACTIONAL LEGAL MALPRACTICE CLAIMS: Application of the "Case within a Case" Standard*, 50 No. 3 DRI For Def. 48 (2008) (noting that, in the author's opinion, the majority of courts that have addressed causation in a transactional malpractice claim have adopted the case within a case standard).

chance type action. He argues that there is a cognizable malpractice claim if an attorney's actions merely resulted in a loss of chance to avoid excess litigation.

At least one secondary source has characterized the "case within a case" approach as representing the general rule in the transactional context.[45] The most cited case supporting this approach is the Supreme Court of California's decision in *Viner v. Sweet*.[46] That court reasoned that:

> [there is] nothing distinctive about transactional practice that would justify a relaxation of, or departure from, the well-established requirement in negligence cases that the plaintiff establish causation by showing either (1) *but for* the negligence, the harm would not have occurred, or (2) the negligence was a concurrent independent cause of the harm.[47]

There, the court rejected an intermediate appellate court's reasons for relaxing the but for test for causation. The lower court relaxed the standard because of the large number of variables necessary to evaluate transactional success when compared to success in litigation. In rejecting a relaxed causation standard, the Supreme Court of California observed that "[c]ourts are properly cautious about making attorneys guarantors of their clients' faulty business judgment."[48]

Other high courts have likewise required a showing of "but for" causation. For instance, the Supreme Court of Minnesota formally adopted this approach in the transactional setting in *Jerry's Enterprises, Inc. v. Larkin et al.*[49] There, the court held that in a transactional malpractice matter, "the [proximate cause of damages element] of a cause of action is modified to show that, but for defendant's conduct,

---

[45] *See* Palmeri & Hardy, *TRANSACTIONAL LEGAL MALPRACTICE CLAIMS: Application of the "Case within a Case" Standard* (describing the "case within a case" standard as the majority approach).
[46] 70 P.3d 1046 (Cal. 2003).
[47] *Id.* at 1051.
[48] *Id.* at 1053 (citing Bauman, *Damages for Legal Malpractice: An Appraisal of the Crumbling Dike and Threatening Flood* (1988) 61 TEMP. L. REV. 1127, 1154–55).
[49] 711 N.W.2d 811 (Minn. 2006).

the plaintiff would have obtained a more favorable result in the underlying transaction than the result obtained."[50] When articulating this standard, the Supreme Court of Minnesota held that without a demonstrated failure in the underlying transaction, proximate cause cannot be established under this rule.[51] This approach fits loosely within a "case within a case" analysis. In order to prove causation under this standard, a plaintiff must demonstrate consequences that resulted from the alleged negligence in contrast to what should have resulted from the transaction.[52]

Courts applying this but for standard in transactional malpractice cases require evidence of the potential missing links in the causal chain. Specifically, in claims involving an alleged failure to "obtain or advise of a provision, concession or benefit, the [plaintiff-]client must prove that the other party would have agreed."[53] Evidence that the other party "might have" agreed to the term is insufficient to meet this showing.[54] These courts reason that without such a showing, juries would have to speculate regarding a myriad of possibilities that could have occurred following the suggestion or failure to suggest an additional term to an agreement. The California Supreme Court and the Supreme Court of Virginia have both required plaintiffs to meet this burden.[55] In doing so, they recognize that absent evidence that the other

---

[50] *Id* at 819; *See also Adams v. Manion*, 2017 WL 2729603 at *2 (Minn. Ct. App. June 26, 2017) (quoting *Jerry's Enterprises, Inc.*, 711 N.W.2d at 819); *Viner*, 70 P.3d at 1054 (finding that a plaintiff must show "but for the alleged malpractice, it is more likely than not that the plaintiff would have obtained a more favorable result").

[51] *Id.*

[52] 3 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 24.5 (2019 ed.).

[53] *Id.* (citing *Hazel & Thomas, P.C. v. Yavari*, 465 S.E.2d 812, 815 (Va. 1996)).

[54] *Id.* (citing *Hazel*, 465 S.E.2d at 815 (finding the plaintiff did not show the other party would have still agreed to the contract where the other party stated he did not know if he would have granted a request for the added provision in the agreement at issue, but "certainly would have found a way to make the deal happen")).

[55] *Viner*, 70 P.3d at 1053; *Hazel*, 465 S.E.2d at 815.

party would have likely agreed to the term, a plaintiff-client has not shown that the negligence proximately caused a loss.[56]

The Court recognizes that apart from these jurisdictions, others relax the nexus necessary to demonstrate proximate cause of harm. For instance, Mr. Sherman relies upon the Wisconsin decision in *Estate of Campbell v. Chaney*.[57] In that decision, the Court of Appeals of Wisconsin examined a claim involving a premarital agreement.[58] The plaintiff alleged that because of how a drafting attorney structured an agreement, the plaintiff had to engage in unnecessary litigation.[59] Namely, in *Chaney*, the underlying case settled before a final decision, but after some litigation.[60] In framing the standard regarding causation, the Wisconsin high court required a showing "that the attorneys' negligence caused weakness in the prenuptial agreement and that the weakness caused litigation."[61] The court reasoned that it was "immaterial that the agreement might later be enforced after a finding that the widow already knew the financial information . . .. [I]f [a failure] caused the [plaintiff] to settle a claim that a proper agreement would have made meritless, then the attorney may be held liable."[62]

The defendant-attorney in *Chaney* argued a strict "case within a case" approach to causation; namely, he argued that because the agreement was not

---

[56] *See Viner v. Sweet*, 117 Cal. App. 4th 1218 (Cal. Ct. App. 2004) (finding on remand, while recognizing that an "express concession" by the other party of what they would have agreed to is not necessary and that circumstantial evidence can be used to establish causation, that the plaintiff did not identify direct or circumstantial evidence of causation in support of the claim); *see also Hazel*, 465 S.E.2d at 815 (finding the plaintiff failed to provide sufficient evidence of his attorneys' negligence when he could not point to any evidence that the other party would have agreed to the additional provisions).

[57] 485 N.W.2d 421 (Wis. Ct. App. 1992).

[58] *Id.* at 423.

[59] *Id.*

[60] *Id.*

[61] *Id.* at 425.

[62] *Id.*

nullified by judicial decision because the parties had settled mid-litigation, there was no cognizable malpractice claim.[63] In rejecting that argument, the Wisconsin high court adopted a relaxed standard for causation for transactional based claims.[64] When doing so, that court applied what seems to be an improper burden shift.[65] Namely, it denied summary judgment because *the defendant-attorney* could not show that the plaintiff settled despite a strong probability that the plaintiff would have prevailed.[66] Such an approach does not comport with traditional tort concepts. Rather, it constitutes an improper burden shifting in a loss of chance setting. In fact, it provides for what is nearly alternative liability. Delaware case law has never accepted alternative liability as an exception to the requirement for traditional proximate causation.[67]

The Seventh Circuit Court of Appeals has also held that proving a case within a case is unnecessary in transactional legal malpractice claims.[68] Namely, in *Nicolet Instrument Corp. v. Lindquist & Vennum*, the Seventh Circuit examined a district court's granting of summary judgment. The district court granted summary judgment because the Plaintiff could not prove that the other party would have agreed to the term at issue.[69] The Seventh Circuit reversed, holding that "but for" causation is not the appropriate benchmark in transactional legal malpractice

---

[63] *Id.*

[64] *Id.* (finding the question for summary judgment purposes was "whether the defendant's alleged negligence forced the estate to engage in litigation it otherwise would not have had to engage in").

[65] *Id.* at 426.

[66] *Id.*

[67] *State Farm Fire & Cas. Co. v. Middleby Corp.*, 2011 WL 683883, at *3 (Del. Super. Feb. 8, 2011) (explaining that "[i]n the nearly twenty-five years that have passed since *Nutt* [*v. A.C. & S. Co., Inc.*, 517 A.2d 690 (Del. Super. 1986)], the legislature has not authorized collective liability under either the market-share or alternative liability theories, and the Court perceives no reasoned basis for it to impose such a change now").

[68] *Nicolet Instrument Corp. v. Lindquist & Vennum*, 34 F.3d 453 (7th Cir. 1994)

[69] *Id.* at 455–56.

actions.[70]  To the contrary, it applied what it described as a "not very demanding standard."[71]  In doing so, it recognized the difficulty of proof of causation in legal malpractice cases in even the litigation setting, and the significantly greater difficulty involved in the transactional setting where there often is no "right outcome."[72]  Because of that difficulty, the Seventh Circuit relaxed the standard and did not require the plaintiff to prove that the other party would have likely agreed to the additional term.[73]

These cases and others like them differ from Delaware precedent that applies traditional concepts of proximate cause consistently among tort claims.  In legal malpractice claims, the Delaware Supreme Court's only decision addressing causation, although in the litigation malpractice context, recognized that traditional proximate cause, with a "but for" floor for liability, applied.[74]  Alternative liability has not been applied in Delaware in any setting.[75]  Moreover, there is no support in Delaware law to relax the standard for only one sub-set (*transactional* legal malpractice claims) of one type of claim (legal malpractice claims in general), merely because the former, by nature of the challenged attorney action, has an increased number of variables that make it more difficult to prove.

---

[70] *Id.* at 455.

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Flowers*, 2011 WL 3592966 at *2.

[75] *Nutt v. A.C. & S. Co., Inc.*, 517 A.2d 690, 694 (Del. Super. 1986) (referencing *In re Asbestos Litig.*, 509 A.2d at 1118 when "declin[ing] to adopt the alternative liability theory in Delaware. [The Court is] satisfied that such a change in traditional tort law should be left to the legislature"); *In re Asbestos Litig.*, 509 A.2d 1116, 1118 (Del. Super. 1986) (explaining that an assumption of product identification would be "mere speculation and would be the establishment of something akin to market-share liability . . . , a change in Delaware tort law which if desired this Court believes is best left to the legislature"), *aff'd sub nom. Nicolet, Inc. v. Nutt*, 525 A.2d 146 (Del. 1987).

A recent Supreme Court of Mississippi decision that addressed a legal malpractice claim in the transactional context is persuasive.[76] In *Gulfport OB-GYN, P.A. v. Dukes*, that court examined a claim involving an employment agreement's covenant not to compete.[77] An employee left the plaintiff-client's medical practice to start her own practice and challenged its enforceability.[78] After the departing physician prevailed, the plaintiff-client filed a legal malpractice claim against the law firm that drafted the employment agreement because of a missing provision.[79]

In affirming the lower court's decision to grant summary judgment, the Supreme Court of Mississippi described the required showing of proximate cause where an underlying transaction is at issue.[80] It explained that a legal malpractice claim requires a plaintiff to establish proximate cause by the trial-within-a-trial test, and that while transactional claims may not involve a "trial" or "case," the "same principles apply: causation 'turns on whether the attorney's conduct was the but-for cause of the failure to obtain a more favorable result rather than success or failure in litigation.'"[81] Noting that a substantial majority of courts have followed this rule,[82] the Mississippi court persuasively held that where the

> complaint is that the attorney should have proposed different or additional terms to a transaction, the malpractice plaintiff must show

---

[76] *Gulfport OB-GYN, P.A. v. Dukes, Dukes, Keating & Faneca, P.A.*, --- So.3d ----, 2019 WL 4071721 (Miss. Aug. 29, 2019).

[77] *Id.* at *1.

[78] *Id.*

[79] *Id.*

[80] *Id.* at *2–4.

[81] *Id.* at *2 (quoting *Frederick v. Wallerich*, 907 N.W.2d 167, 173 (Minn. 2018)) (citing Mahaffey Jr., *Cause-in-Fact*, at 436–37).

[82] *Id.* (citing John M. Palmeri, Franz Hardy, Nicole Salamander Irby, *Better Deal or No Deal: Causation in Transactional Malpractice Cases*, 42 COLO. LAW. 51, 51 (Dec. 2013), which in turn cited *Viner v. Sweet*, 70 P.3d 1046 (2003); *Serafin v. Seith*, 672 N.E.2d 302 (1996); *Blackhawk Building Systems, Ltd. v. Aspelmeier, Fisch, Power, Warner and Engberg*, 428 N.W.2d 288 (Iowa 1988); *Jerry's Enters., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811 (Minn. 2006); *Froom v. Perel*, 872 A.2d 1067 (N.J. App. Div. 2005); *Hazel and Thomas, P.C. v. Yavari*, 465 S.E.2d 812 (Va. 1996); *Cannata v. Wiener*, 789 A.2d 936 (Vt. 2001)).

that such terms would have been accepted by the other party or that the client would not have entered into the deal and would have been better off for doing so. Absent such proof there exists no genuine issue of material fact as to causation of damages, and summary judgment is appropriate.[83]

Proving causation in a transactional malpractice claim, as in a litigation malpractice claim, requires proof that, but for the attorney's negligence, the plaintiff would have obtained a more favorable result. While ultimate success in litigation in a case like Mr. Sherman's does not *per se* bar a malpractice claim, when the claim involves alleged negligence in not proposing or including an additional term in a proposed agreement, the plaintiff-client must first show that the other party would have agreed to the omitted term. Without evidence of record supporting a reasonable inference that the opposing party would more likely than not have agreed to the term, there is no genuine issue of material fact regarding proximate cause of damages.

**Mr. Sherman does not demonstrate a genuine issue of material fact regarding proximate cause of damages.**

At the outset, Mr. Ellis meets his initial burden on summary judgment as to proximate cause. He emphasizes that the Supreme Court held the Agreement to be enforceable. As a result, Mr. Sherman prevailed in the underlying litigation. Accordingly, the burden shifts to Mr. Sherman to demonstrate an issue of fact regarding proximate cause of harm.

In response to Mr. Ellis's motion, Mr. Sherman emphasizes the conflicting deposition testimony of the expert witnesses.[84] He also claims the amount of damages he suffered are not speculative because his litigation attorney, Mr. Gagne, quantified the alleged harm as extra fees and costs incurred during the Family Court

---

[83] *Id.* at *4.
[84] Pl. Response, at 3–8.

24

litigation and Supreme Court appeal.[85]  In his testimony, Mr. Gagne provides an estimate of the attorneys' fees that Mr. Sherman would have incurred had the waiver of disclosure language been included in the Agreement.[86]  Specifically, Mr. Gagne believed there would have been no need to hire experts for the Family Court litigation,[87] and that the trial in Family Court would have taken approximately one-half a day.[88]  He conceded, however, that he would have still taken some depositions and would have had to litigate the matter in Family Court.[89]  Based on this reasoning, Mr. Gagne estimated that the litigation would have cost Mr. Sherman approximately $35,000 to $50,000 in comparison to the $310,000 he charged him.[90]

Mr. Gagne's estimation of the difference in costs—or in other words, an identification of the amount of damages Mr. Sherman incurred—provides sufficient evidence for a reasonable jury to fix an amount of damages.  That, however, is not all that is required.  There must be sufficient evidence for it to reasonably infer that the alleged negligence proximately caused the harm.

The evidence of record when considered in the light most favorable to Mr. Sherman does not permit that bridge.  Namely, Mr. Sherman does not meet his burden by demonstrating that there is a genuine issue of fact regarding whether the costs and fees would not have been incurred but for Mr. Ellis's alleged negligence.[91]

---

[85] *Id.* at 9–10.
[86] Pl. Response, Ex. F, at 42–43.
[87] *Id.* at 42:7–42:13 (stating "[s]o with the waiver language in, I would not have retained the experts for the valuations . . . I believe the expert costs and fees associated with depos, and that was to 38,000.00").
[88] *Id.* at 42:18–42:19 (stating "[i]t would have been probably a half day trial").
[89] *Id.* at 42:13–43:4 (stating "I would have had to go to a trial in Family Court, nonetheless, I would have had the waiver – I still would have taken Tom Gay's deposition, which I did. I still would have done that even under the err [sic] set of circumstances . . . I still would have taken Ms. Sherman's deposition . . . [Mr. Sherman] would have been . . . And I assume Ms. Dougherty would have taken Mr. Ellis's deposition even had the waiver language be [sic] in there").
[90] *Id.* at 43:4–43:18 (stating "[a]n estimate, probably 35 to 50 [thousand dollars]").
[91] *Flowers*, 2011 WL 3592966 at *2.

Because the underlying action is a transaction and involves the claim that Mr. Ellis failed to include a particular provision in the Agreement, Mr. Sherman would have to demonstrate evidence justifying a jury's inference, that more likely than not, his ex-wife would have accepted the Agreement *with the additional provision*.

In this regard, the Court recognizes that the evidence permits a clear inference that she *might have*.[92] This "might have" evidence includes the ex-wife's agreement to other unfavorable terms, and Ms. Jones's expert opinion.[93] Alone, the former does not constitute a circumstance supporting an inference of a probability that Mr. Sherman's ex-wife would have agreed to a wholly separate term. In addition, Ms. Jones conceded the same in her deposition testimony where she admitted that speculation would be necessary to make that assumption.[94] In support of Ms. Jones's opinion regarding proximate cause of harm, she cited the fact that Mr. Sherman's ex-wife signed the Agreement against her attorney's advice. Nevertheless, Ms. Jones testified that she does not "think there is any way of knowing where [sic] whether she would have refused signing the prenup if that statement had been in there or not."[95] In fact, she confirmed the degree of speculation regarding the ex-wife's agreement to such a term to be "pure speculation."[96]

Here, the record contains no testimony from Mr. Sherman's ex-wife, one of the two parties to the Agreement, bearing on this material issue. Nor does it contain testimony from the attorney who advised her. As recognized in the *Viner* decision, while an express concession of acceptance is not necessary to prove proximate cause

---

[92] *See* Mallen & Smith, *Legal Malpractice* (citing *Hazel*, 465 S.E.2d at 815 when explaining that it is "not sufficient to show that the other party 'might have' agreed" to prove proximate cause of harm in a transactional malpractice claim).
[93] Pl. Response, Ex. D "Deposition of Judy M. Jones," at 39:15–46:5.
[94] *Id.* at 40:1–40:4.
[95] *Id.* at 41:12–41:15.
[96] *Id.* at 41:15.

of harm, there must at a minimum be circumstantial evidence of a probability of acceptance of the term.[97]

The Court recognizes that proving proximate cause of harm will often be challenging in circumstances, such as the one at hand, where the decision maker was and remains an adverse party to the malpractice-plaintiff. As the California Supreme Court correctly recognized in *Viner*, however, "difficulties of proof cannot justify imposing liability for injuries that the attorney could not have prevented by performing according to the required standard of care."[98] On balance, the record contains no evidence—direct or circumstantial—that permits a reasonable inference that Mr. Sherman's ex-wife would have more likely than not agreed to this critical term. Because (1) the but for standard for proximate cause represents the evidentiary floor for establishing proximate cause, and (2) a critical link in the causal chain is missing in this record, summary judgment must be granted in favor of Mr. Ellis.

## Conclusion

When considering the facts of record in the light most favorable to Mr. Sherman, there is no genuine issue of material fact regarding whether Mr. Ellis proximately caused Mr. Sherman's alleged damages. As a result, Mr. Ellis's Motion for Summary Judgment must be **GRANTED**.

---

[97] *Viner*, 70 P.3d at 1053.
[98] *Id.*